# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
TORRELL SAXON,

                    Petitioner                    13 Civ. 4966 (ER)
                                                          Affirmation of Attorney
     - v -

UNITED STATES OF AMERICA,

                    Respondent.
------------------------------------------------------x

        AMY M. ATTIAS, an attorney admitted to practice in this Court, affirms under penalties of perjury that the following is true.

1. I represented Torrell Saxon on Indictment 12 Cr. 320 (ER), from the inception of his case in the federal court in March, 2012, through his sentencing on May 30, 2013. Initially I represented him pursuant to my employment with the Federal Defenders of New York. When I left that office, Mr. Saxon appeared before the Honorable Kenneth M. Karas and asked that I continue to represent him. Judge Karas assigned me to continue my representation of Mr. Saxon pursuant to the Criminal Justice Act.

2. Mr. Saxon was charged with being a felon in possession of a weapon, in violation of 18 U.S.C. 922(g). As an Armed Career Criminal, his minimum exposure was a mandatory 15 years.

3. Mr. Saxon was sentenced by the Honorable Edgardo Ramos to a period of 120 months, or 10 years, incarceration. He now complains that I was ineffective, although he was sentenced to five years less than his original mandatory minimum, and although the government dismissed the weapons charge and he pled only to low-level drug counts.

4. From the start, my conversations with Mr. Saxon – and there were many – centered on the strength of his defense, and the risks of trial because of the mandatory minimum. I believed that he had a possible chance of winning trial, but was, as always, very concerned about a conviction, especially with

his criminal record. I counseled him that the trial could possibly go well, but could easily go very badly.

5. In the summer of 2012 I began having strategic discussions with Mr. Saxon. I counseled him to consider participating in a so-called "Innocence Proffer," where he would tell his side of the story to the government without any protections. Our goal was to convince the government that the gun charge was problematic enough for them that they should offer Mr. Saxon a plea to the pills that he admitted to selling -- which, in fact, is exactly the result he got.

6. In making the decision to suggest an Innocence Proffer, I discussed the case with various colleagues, because it is an unusual and an aggressive method of dealing with a case. As I was then still employed with the Federal Defenders, I also got the approval of the then-Director of Training, Steve Statsinger.

7. Mr. Saxon and I had multiple conversations about this tactic before he agreed to meet with the government.

8. One of his complaints is that I undermined his legal position by sharing information with the government regarding the facts of his case. Having agreed to pursue the tactic of an aggressive plea negotiation, all information that I shared or discussed with the government was simply part and parcel of the necessary exchanges in our negotiations. Saxon himself participated in an Innocence Proffer where he spoke in detail for several hours about the facts of his case. Without an open exchange of information, this tactic could not work.

9. While meetings and negotiations were proceeding, Mr. Saxon was also pushing for a trial to be held as quickly as possible. Things came to a head when a date for trial was set before Judge Ramos. In a series of meetings and negotiations that took place in the United States Attorney's Office, with Mr. Saxon present, a deal was made. The government would dismiss the weapons charge, and Mr. Saxon would plead guilty to 2 drug counts. The government preserved the right to request a 2-point enhancement for the defendant's

10. Mr. Saxon was very upset at the inclusion of the gun clause, and expressed in no uncertain terms that he thought it was not fair. Negotiations continued, and eventually the word came back that it was either those terms or trial. Mr. Saxon chose the terms.

11. The defendant fully allocuted to his guilt at a hearing before Judge Ramos. He expressed that he fully understood all the terms of the plea, although he was unhappy about the gun clause. Several months later he expressed his desire to withdraw his guilty plea, and the parties again came before Judge Ramos. At that hearing, and after he and I had been afforded an opportunity to discuss his decision, Saxon stated that he had reconsidered the situation, and wished to let his plea stand.

12. A two-day Fatico hearing was held before sentencing, and Judge Ramos found that the 2-point enhancement was appropriate.

13. Driven almost completely by his own criminal record, Mr. Saxon's guidelines were 151 to 188 months. He was sentenced to a below-guideline sentence of 120 months.

14. Saxon alleges that I made promises as to what his sentence would be. In over 25 years of federal practice, I have not promised a defendant what his sentence would be, nor did I do so here. I told him I would suggest a sentence in the 5-year range, but that 7, 8 or even 10 years was significantly better than the mandatory 15 he had been facing. I reminded him constantly that his sentence would be determined exclusively by Judge Ramos.

15. The defendant completely understood everything that occurred in his case. We spoke and conferred constantly. The level of his distress over the inclusion of the possible gun enhancement clearly demonstrates that he understood the terms of his plea, and did not like this one. Nevertheless, both in private with me and again in open court, he accepted the terms. As he agreed to waive his right to appeal he now attacks the case on the only other grounds left: my ineffectiveness. That is just simply untrue and unfounded.

_____
AMY M. ATTIAS

Dated: December 9, 2013
       Croton-on-Hudson, New York