# Exhibit D

20135usaxos

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   UNITED STATES OF AMERICA

4
            v.                        S1 12 Cr. 320(ER)
5
                                        SENTENCE
6
    TORRELL M. SAXON,
7
            Defendant.
8
    ------------------------------------x
9

10                                  United States Courthouse
                                    White Plains, N.Y.
11                                  May 30, 2013
                                    12:30 p.m.
12

13

14  Before:
                    THE HONORABLE EDGARDO RAMOS,
15
                                    District Judge
16

17

18
                            APPEARANCES
19

20  PREET BHARARA
        United States Attorney for the
21      Southern District of New York
    MICHAEL GERBER
22      Assistant United States Attorney

23

24  AMY ATTIAS
        Attorney for Defendant
25

20135usaxos

1        THE DEPUTY CLERK:  United States of America v. Torrell

2   Saxon.

3        Counsel, please state your appearances for the record,

4   beginning with the government.

5        MR. GERBER:  Michael Gerber for the United States.

6        Good afternoon, your Honor.

7        THE COURT:  Mr. Gerber.

8        MS. ATTIAS:  Good afternoon, Judge.  Amy Attias for

9   Mr. Saxon.

10        THE COURT:  Good afternoon, Ms. Attias.

11        And good afternoon to you, Mr. Saxon.

12        THE DEFENDANT:  Good afternoon.

13        THE COURT:  We are here today to impose sentence in

14   the case U.S. v. Torrell Saxon.

15        On April 17 and 23 of this year, we held a Fatico

16   hearing in order to determine whether an enhancement pursuant

17   to 2D1.1(b)(1) of the Sentencing Guidelines was warranted due

18   to Mr. Saxon's use of a gun in connection with the underlying

19   narcotics distribution conviction, so let's deal with that

20   first.

21        At the hearing, the government presented numerous

22   exhibits as well as the testimony of Juan Moreira Adular, a

23   resident of 221 North Street in Middletown, the residence where

24   the incident occurred, and Gregory Klees, an ATF firearms and

25   toolmark examiner who testified as an expert witness in

20135usaxos

1  firearms and toolmark identification, in support of its

2  position that Saxon possessed a firearm on March 25, 2012.

3         In support of his position to the contrary, Saxon

4  testified and also presented the testimony of Brook Weinberg

5  Cameron, who testified as an expert in criminalistics,

6  Middletown Police Officer Achmed Artola, who responded to the

7  scene of the incident on March 25, and Middletown

8  Identification Officer Michael Brownstein, who conducted the

9  crime scene investigation.  Saxon also presented various

10  exhibits, including two sworn statements made by Rodrigo

11  Perez-Suarez, another purported victim.

12         The government contends that, on the night of March

13  24, 2012, Saxon arrived at 221 North Street in possession of a

14  firearm and that Saxon fired the weapon three times while

15  inside the residence.  Moreria testified that, upon entering

16  his apartment through the back door, which was located in the

17  kitchen, at approximately 11:30 p.m., he observed a

18  dark-skinned man, the defendant, pointing a gun at Perez' head.

19  The defendant and Perez were standing by the front door of the

20  apartment.  Moreria began to walk from the kitchen towards the

21  front door, at which point the defendant fired the gun twice in

22  Moreria's direction.  A struggle ensued between the defendant,

23  Rodrigo and Moreria, Rodrigo Perez and Moreria, during which

24  Moreria and Perez attempted to get the gun out of the

25  defendant's hands.  At some point during the struggle, two

20135usaxos

1  other Hispanic men who were present in the apartment joined in.

2           During the struggle, the four Hispanic men pushed the

3  defendant against the door of the bedroom identified as bedroom

4  one.  A shot was fired from the weapon which was positioned

5  against the door, and a bullet entered the door.  The door of

6  bedroom one opened, and the men fell into the bedroom, at which

7  time the defendant released the gun, which fell onto a basket

8  that was on the floor of the bedroom.  The Hispanic man then

9  proceeded to hold the defendant on the floor while they called

10  911 and waited for the police to arrive.

11          When the police arrived at the apartment, they

12  recovered a Walther P 22 caliber semi-automatic handgun and

13  three shell casings.

14          Moreria's testimony was corroborated by the testimony

15  of Klees and the forensic evidence presented by the government.

16  Moreria's testimony was further corroborated by the version of

17  events contained in two sworn statements that Perez provided to

18  law enforcement officers on March 22, 2012 and September 6,

19  2012, which were entered into evidence by the defendant.  Both

20  statements placed the gun in the defendant's hands, and both

21  statements described the defendant firing the weapon.  And

22  finally, the version of events recounted by Moreria and Perez

23  was further corroborated by the 911 call that was entered into

24  evidence by the government.

25          Saxon's version of events, in relevant part, and to

20135usaxos

1   the extent it differs from the government's version, is as
2   follows:

3          On the night of March 24, 2012, Saxon was brought to a
4   residence at 221 North Street in Middletown, New York by a
5   female acquaintance who told Saxon that he would be able to
6   sell prescription pills in his possession at that residence.
7   According to Saxon, when they arrived at 221 North Street, the
8   woman told him to wait on the porch outside while she went
9   inside to speak to someone.  After speaking to someone inside
10  the apartment in Spanish for a few minutes, the woman told
11  Saxon to go inside.

12         Saxon claims that, upon entering the residence, Perez
13  grabbed the woman and pulled her out of the way while four or
14  five men began to attack Saxon.  Saxon testified that the man
15  went into his pockets and removed his clothing in an effort to
16  rob him.  During the ensuing struggle, Saxon observed the
17  firearm in the possession of Perez.  According to Saxon, only
18  one shot was fired from the gun during the struggle.  Saxon
19  testified that he did not have a gun on him on the night in
20  question and that he did not shoot a gun.  Saxon only recalls
21  one shot in the residence -- one gun in the residence, and only
22  one gun was recovered by the police.

23         The only evidence in the record that supports Saxon's
24  version of events is the defendant's own testimony, and Saxon's
25  testimony was not consistent with the other evidence in the

20135usaxos

1    record. Further, Saxon testified that he drank a significant

2    amount of alcohol on the night in question and that he was

3    drunk at the time of the incident. Saxon also admitted that he

4    did not remember much of the night in question prior to

5    reviewing the discovery that was produced in this case.

6             By contrast, the government presented the credible

7    testimony of Moreria, which was corroborated by the expert

8    testimony of Klees and the forensic evidence introduced by the

9    government during the hearing. Additionally, the defendant's

10   expert witness agreed with all of Klees's conclusions regarding

11   the bullet strikes in the residence. Moreria's testimony,

12   which placed the gun in Saxon's hands and describes Saxon

13   firing the weapon, was further corroborated by the sworn

14   statements of Perez, which were offered into evidence, again,

15   by the defendant.

16            Therefore, the Court concludes that the government has

17   proven by a preponderance of the evidence that Saxon was in

18   possession of a firearm on the night in question and that he

19   discharged that firearm in the apartment at 221 North on the

20   night in question.

21            Accordingly, for purposes of sentencing, the

22   enhancement is appropriate, and the offense level will be

23   calculated accordingly.

24            That constitutes the decision of the Court with

25   respect to the Fatico hearing.

20135usaxos

1    Now, with respect to sentencing, in preparation for

2    today's proceeding, I have reviewed the presentence report

3    dated May 22, 2013 prepared by U.S. Probation Officer Michael

4    Fisher, which includes the sentencing recommendation.  I've

5    also reviewed the sentencing memorandum submitted by Ms. Attias

6    dated May 27, which includes a letter submitted on behalf of

7    Mr. Saxon by members of his family.  And I've also reviewed the

8    letter submitted by Mr. Gerber dated May 29, 2013.

9    Is there anything else that I should have received or

10   reviewed?

11   MR. GERBER:  No, your Honor.

12   MS. ATTIAS:  Not from me, Judge.

13   THE COURT:  Very well.

14   Ms. Attias, have you read the presentence report and

15   discussed it with your client?

16   MS. ATTIAS:  Yes.

17   THE COURT:  And Mr. Saxon, have you read the

18   presentence report?

19   THE DEFENDANT:  Yes.

20   THE COURT:  And apart from the issue concerning the

21   gun, are there any objections to the report regarding its

22   factual accuracy?

23   MS. ATTIAS:  No.

24   THE COURT:  Mr. Gerber?

25   MR. GERBER:  No, your Honor.

20135usaxos

1     THE COURT:  Although I am not required to impose a

2  sentence within the sentencing range calculated under the

3  guidelines, I am required to consider the guidelines in

4  imposing sentence.  To do so, I need to determine the

5  applicable sentencing range.

6     I note that the sentencing range calculation in the

7  presentence report is the same as the guidelines range in the

8  government's plea agreement with Mr. Saxon.  And I find that

9  the base offense level is 16 to which are added two levels for

10  use of a gun pursuant to Section 2D1.1(b)(1) of the U.S.

11  Sentencing Guidelines.  However, because Mr. Saxon qualifies as

12  a career offender pursuant to Section 4B1.1 of the guidelines,

13  the total offense level -- or the base offense level is deemed

14  to be 32 from which are subtracted three levels for acceptance

15  of responsibility, yielding a total offense level of 29.

16     Mr. Saxon's criminal history category is V.  However,

17  based on his designation as a career offender, the criminal

18  history category is automatically deemed to be VI.

19     Accordingly, I find that the total offense level is

20  29, the criminal history category is VI, and the sentencing

21  range is 151 to 188 months.

22     With respect to Count Two, because the statutory

23  maximum is five years, the effective total offense level for

24  Count Two is 60 months.

25     Does the government wish to be heard prior to

20135usaxos

1    sentencing?

2                MR. GERBER:  Yes, your Honor.

3                The government believes that a sentence within the

4    guidelines range of 151 to 188 months is appropriate here.

5                And with the Court's permission, I'll first say a

6    little bit about the defendant's criminal history and the

7    conduct to which he pled guilty in this case and then turn for

8    a moment to the issue of the possession of the gun, the

9    discharge of the gun, that the Court just addressed.

10               This is a case, the government submits, in which there

11   is a need for deterrence, and there is a very, very powerful

12   need for deterrence, there was a prior three-year sentence

13   imposed on the defendant, there was a prior eight-year sentence

14   imposed on the defendant.  And those sentences did not deter

15   the defendant from criminal activity.

16               As we discussed in our letter to the Court, the

17   defendant keeps on coming back to crime.  And while defense

18   counsel makes the point that the career offender status has a

19   significant impact on the guidelines here, that is certainly

20   true, and defense counsel makes the point that the quantity of

21   drugs at issue here with respect to the instant offense is

22   relatively small as compared to other drug cases that this

23   Court sees, that's true, as well, but the whole point of the

24   career offender guidelines is to address a situation like this,

25   where the defendant has, time and again, committed serious

20135usaxos

1   criminal acts, whether it's a prior drug conviction or two

2   prior robbery convictions.  Prior sentences, significant

3   sentences, just have not worked to deter the defendant from

4   turning to crime.

5           The defense also speaks about the personal challenges

6   that the defendant has faced, and that is, of course, relevant

7   under 3553(a), but what is also relevant is that the defendant

8   has engaged in crimes that have hurt people time and again.

9   Those robberies hurt people.  The drug dealing hurts people.

10  Preys on addicts.  It's making a buck off of addicts.  And

11  while, yes, the Court can and should consider personal

12  challenges the defendant has faced, the government believes it

13  should also consider the harm that he has caused.

14          Let me just say a word about the gun and the shooting.

15          The defendant walked into 221 North Street, and he

16  shot at Juan Moreria.  Mr. Moreria was minding his own

17  business.  He was minding his own business, and the defendant

18  came in and shot him.

19          People shouldn't have to be afraid when they come into

20  their apartment at night that someone's going to shoot at them.

21  It's extremely serious.  We believe it is appropriate to

22  consider under 3553(a) and under 18 U.S.C. 3661.  And it is a

23  very powerful response to the argument that the defendant is a

24  changed person, that he's sort of past his prior criminal

25  conduct and he's on a different path.  On the contrary.  He has

20135usaxos

1    pled guilty to engaging in drug dealing, and then he went in

2    there with a gun and was shooting.  And it speaks to the

3    defendant's dangerousness, and, again, it further speaks both

4    to the characteristics of the defendant, the defendant's

5    history and the importance, the need, for deterrence here.

6            So, for those reasons, the government respectfully

7    submits that a guidelines sentence is appropriate here.

8            THE COURT:  Thank you, Mr. Gerber.

9            Ms. Attias, do you wish to be heard?

10           MS. ATTIAS:  Yes, I do, Judge.  Thank you.

11           Judge, in light of your decision on the Fatico

12   hearing, and, obviously, as I was preparing my letter, I knew

13   that you could decide either way, I want to make some

14   adjustments to what I suggested in my letter, but I don't go

15   much farther off from the request I made.

16           The computation of the guidelines without regard to

17   the career offender statute is, if you had found that he did

18   not have a gun by a preponderance of the evidence, he was

19   looking at 31 to 37 months.  Now that you have found that he

20   did, to a preponderance of the evidence, have the gun on the

21   night of the incident, his guidelines, without going into the

22   career offender statute, would have been 37 to 46 months.

23           In my letter, I asked your Honor to give him a

24   sentence of 36 months, and that was looking at the guidelines

25   without the gun.  So, now, taking the gun into consideration,

20135usaxos

1   his guidelines would still have been 37 to 46 months.  You

2   found, after the hearing, that you believe that a two-point

3   enhancement applies, and I obviously completely respect that,

4   so I want to talk about how that should affect my request of

5   three years, 36 months.

6          Judge, at the top of the guidelines sentence, if

7   Mr. Saxon were not to be treated as a career offender, he would

8   be looking at 37 to 46 months.  I believe that this Court could

9   fairly, and within the constraints of the parsimony clause of

10  3553(a) of United States Code, where the Court is instructed to

11  fashion a sentence that is sufficient, but not greater than

12  necessary, I believe that something at the top of the guideline

13  range of 37 to 46 months or perhaps even to go slightly above

14  that guideline range would bring us to a realistic range that

15  would punish Mr. Saxon for what he's done in this case, which

16  is the pill sales over the course of approximately two and a

17  half years.

18         So, to get into that, I need to just review his

19  background a little bit because I think that it is extremely

20  important when you are deciding whether or not you're going to

21  treat him as a career offender, which is discretionary.  It's

22  not a mandatory status by any means.  So I spent some time with

23  him talking about his prior offenses because I think that they

24  become critical in your Honor's decision about whether to give

25  him something in the guidelines without that statute or with

20135usaxos

 1 | it.

 2 | So his first conviction, at the age of 19, is an

 3 | undercover sale.  He's arrested.  He takes the plea.  He gets

 4 | one to three.  In my experience, that was, for Manhattan or the

 5 | Bronx, pretty high, but he gets one to three.

 6 | Shortly after that, he's arrested on the Bronx robbery

 7 | first.  And I've spent some time with him asking how it was

 8 | that he ended up with the two concurrent robbery sentences.

 9 | Obviously, I cannot confirm this, but this is what I am

10 | informed.

11 | He's arrested in the Bronx for a knife-point subway

12 | robbery.  He's on the 6 train, and he commits a knife-point

13 | robbery of a young man on the 6 train.

14 | To go into that robbery for a moment, he had a child

15 | when he was 17.  He was in and out of a relationship with the

16 | mother of that child, but he was constantly trying to provide

17 | money to help support his child.  And she's now, I think, 18.

18 | So I am not excusing his conduct; I'm simply explaining it.  In

19 | my letter, I had already referred to the fact that his having a

20 | child at 17 with a family who was not able to help financially

21 | in any way was what put him on the street.  He had left high

22 | school, and he started doing low-level hand-to-hand street drug

23 | sales.

24 | They were desperate for money.  He was told go out and

25 | get me some money.  I need to get this child some clothing,

20135usaxos

1   some food.  And he took, basically, what was a kitchen knife,

2   went on the subway, saw a young man about his age on the 6

3   train who had actually just been counting some money, and

4   Mr. Saxon went up to that young man and did rob him at

5   knifepoint.  No violence other than the fact that the act in

6   itself, of course, is inherently violent.  No physical injury

7   happened.  No one was hurt.  And he was arrested immediately

8   thereafter.

9            When he was being arrested for that case, he was taken

10  off the 6 train in the Bronx.  And police showed up

11  immediately.  There was another man at the station who said

12  that looks like a guy who robbed me a few days ago.  After that

13  happened, what sounds like to me, Judge, is eight robberies

14  were dropped on him; some in the Bronx, some in Manhattan.  His

15  family then retained counsel and, ultimately, out of the

16  robbery charges that were put on him, he pled to one in the

17  Bronx and one in Manhattan.

18           I will tell you that he informs me that he did not do

19  the Manhattan robbery, he doesn't really know anything about

20  the Manhattan robbery, but, since he was looking at significant

21  time in the Bronx and he was looking at the possibility of

22  trying serial robbery cases, he and his attorney worked that

23  out.  And in my experience, that is not something that is

24  unusual at all, particularly in the state, that a state

25  defendant has multiple charges, multiple indictments, and they

20135usaxos

1    work something out. And that is completely common experience

2    in my mind. So that has the ring of truth into it, that the

3    attorney was able to work out a plea where he took one in

4    Manhattan to cover everything and one in the Bronx to cover

5    everything there.

6         And again, I want to point out, as I did in my letter,

7    that the conduct for those two robberies that he pled to

8    occurred in 1999. That was 13 years before the conduct in this

9    case. He did his time. He got out in 2009. And since that

10   time, he basically reunited with the mother of his young child,

11   who he's known for many years through the family. He moved

12   back in with his family, but now they lived in Middletown as

13   opposed to the Bronx, and things were, by and large, better.

14        I am not going to stand here and make believe that

15   he's been an ideal citizen. We know from the charges that he

16   pled to and from the facts given to the government at the

17   innocence proffer that he was doing low-level pill sales to

18   supplement his income. And again, did he go back into crime?

19   Yes. But I'm going to be realistic here. In terms of going

20   back into crime, selling pills is one of the less offensive

21   ways to make a few extra dollars to supplement his income. I'm

22   not saying it's a good thing. Obviously, I would never go

23   there, Judge. But he didn't start acting violently. He didn't

24   start doing big sales. He had left the gang. And I don't know

25   if your Honor can see from there, but he had left the Bloods,

20135usaxos

1   and when he left the Bloods, his face was slashed on both
2   sides.  And not only did he leave, he was completely out of it.

3       It still didn't put him in a position where he was
4   able to pay his bills.  And you can see from the probation
5   report, the presentence report, that, whatever he made, the
6   most he made was something like 11, 12, 13 dollars an hour.
7   That doesn't go very far.  It doesn't go very far at all when
8   you're paying for transportation and contributing to the
9   family.  And then once his girlfriend became pregnant this
10  time, he needed to ensure that he could help with that
11  situation as well.

12      So should he be punished?  Of course.  But what he's
13  really, really looking at here is doing low-level pills sales.
14  And your Honor has found that he had the gun.  I would think
15  that, in my opinion, 36 months for the pills sales themselves,
16  because of his record, was sufficient.  Mr. Saxon, frankly,
17  asked me to ask your Honor for time served, and I didn't think
18  that was the proper thing to request, and so I didn't.  I
19  thought that, with his record, having gotten out of jail on the
20  robberies and having gone back into selling -- and by the way,
21  they were his own prescription -- by and large from his own
22  prescription and then some from other sources, as well -- but,
23  having gotten back into that, that he needed to be punished
24  more than time served.  And now that you have found that he was
25  in possession of a weapon that night, I would think that an

20135usaxos

1  appropriate sentence that would be sufficient, but not greater

2  than necessary, would be something in the range of 60 months or

3  so.  That's five years.  That would be the sentence that would

4  sentence him fairly for selling the pills, for getting back

5  into that drug world, but wouldn't go overboard, Judge, the way

6  that the career offender statute works here.

7          I do not disagree that there are those defendants that

8  need to be punished severely not only for what they've done,

9  but when there are people who won't stop doing real harm and

10  real violence and really bad things to people, I understand

11  where deterrence comes into the mix.

12          Mr. Saxon's past record, even though he's managed to

13  get himself convicted of four separate felonies, in my opinion,

14  again, none of them are terrible.  They are, you know, a drug

15  sale when he's 19, knife-point robberies.  They're not gunpoint

16  robberies.  He goes back into low-level street, you know,

17  sell-to-who-you-know pill sales afterward.

18          This is not a dangerous man.  Mr. Gerber said that

19  what he does hurts people, the selling pills hurts people.

20  Every crime hurts people.  That's why we punish.  That's why we

21  decide something's criminal, because there's not a crime that

22  happens that doesn't hurt people.  Your task is to figure out

23  what it sufficient, but not greater than necessary.

24          And I would suggest that, in this case, on the facts

25  of this case, where, as I laid out in my letter, certainly his

20135usaxos

1    background came into it.  His crack-addicted father came into

2    it.  His mother, who struggled mightily to put food on the

3    table and is now doing very well and is able to, you know, be

4    more present for her family.  She couldn't be home.  It was

5    almost a prescription for him to hit the street, and that is,

6    in fact, what happened.

7             So when we're looking at his behavior that led to his

8    arrest and ultimate conviction by plea in this case, what is he

9    doing?  He is supplementing his crummy income that he's making

10   from his crummy hourly rate at the legitimate jobs that he's

11   making.  He's with a church-going woman.  He is back in the

12   fold with his church-going family.  He is not an angel.  He's

13   never been an angel.  I'm not suggesting that he was an angel.

14   But when we're looking at what is sufficient, but not greater

15   than necessary, I would suggest that five years, 60 months, is

16   the correct number to be looking at here.

17            And I just want to talk about what Mr. Gerber just

18   briefly addressed, what he said about Mr. Saxon coming into the

19   building and firing at Mr. Moreria, the witness that testified

20   here.  So working from the point that we're assuming that he's

21   telling the truth, because that's what you found, it certainly

22   did not seem as if Mr. Saxon, who was extremely intoxicated,

23   was shooting at anything.  It seemed rather more of a random

24   scattering of shots.  And it does seem as if there were three

25   shots, but, Judge, I just want to recall that there's only two

1  ballistics points, two ballistics markings, that are found in
2  the house.  One is the kitchen mark that ricochets into the
3  back door.  That's one shot.  And the second is clearly during
4  the course of the struggle because that's the door that
5  everyone agrees that they're next to.  Those are the only two
6  shots that we can really point to that actually happened.
7  Whether or not a third was fired, we know that there was a
8  shell, but it's sort of unclear about what happened with that,
9  and the experts really couldn't speak to it.

10       So I would say that, in response to Mr. Gerber saying
11  that Mr. Saxon came into the house and started firing at
12  Mr. Moreria, we know of two shots.  One goes into the door
13  while they're all struggling.  And the other one, I would
14  submit, Judge, that if somebody wanted to shoot down that hall
15  and actually be shooting at somebody, it wouldn't have been too
16  hard to hit somebody.  It's a very small hallway.  You saw all
17  the pictures.  And if he really wanted to hit somebody who
18  testified that he was walking toward Mr. Saxon, he could have
19  almost point-blank fired into him.  They were literally just a
20  few feet away.

21       So, again, working from the point of your decision
22  that he did have the gun that night, I would say that, in his
23  incredibly drunken condition, that, if that gun was fired, and
24  we know that it was fired, that that was a random shot down the
25  hallway and that they were able to get on top of him after

20135usaxos

1   that.

2          So I'm not saying to treat him as a first-timer. He's

3   not a first-timer. But when you look at where he's come from

4   and what he was doing, the real effort to be living a

5   legitimate working life, the bad decisions to do what he knows

6   how to do to supplement that working life by selling pills, I

7   would respectfully suggest that a sentence in the range of 60

8   months would be the proper sentence here.

9          THE COURT: Thank you, Ms. Attias.

10         Mr. Saxon, you have an absolute right to address me

11  before I impose sentence if you wish.

12         THE DEFENDANT: I don't know how to say the stuff

13  that's going on. I was told from the beginning that this gun

14  thing wasn't even going to be used.

15         MS. ATTIAS: Can I have a second, please, Judge. I'm

16  sorry.

17         (Counsel conferred with the defendant)

18         MS. ATTIAS: Thanks.

19         THE DEFENDANT: I just like to say that I know what I

20  was doing was wrong with the pills, but I did that because I

21  was trying to work. I had several jobs. I was doing the best

22  I could. I was under identity theft, and it took me three

23  years, almost the whole time I was out there, to clean that up.

24  I was working other jobs. I was working for two companies.

25  And I was making like 7.25 an hour. It was giving me four

20135usaxos

1   hours a week, like really low paid.  I was just trying to do

2   everything I could.  I was involved with a young lady.  She has

3   my child right now.  And she was helping me.

4          I'm just apologizing.  I'm just --

5          MS. ATTIAS:  Judge, I do just want to say one thing

6   about the identity theft that Mr. Saxon just referred to.  It

7   was kind of striking because, during the probation interview,

8   we talked about this.  He has almost never met his father in

9   his life, but when he got out of jail after his eight-year bit,

10  his natural father, who he was just sort of meeting, actually

11  did take his identity; opened lines of credit, did all kinds of

12  things.  And he really messed up Torrell out there.  It took

13  him ages to straighten that out.

14          THE COURT:  What's his father's name?

15          MS. ATTIAS:  Gregory Slatis.

16          This is mentioned in the report.  But it was pretty

17  striking.  He used his identity.  I'm just looking for my own

18  notes of that interview.

19          It really -- again, not to excuse his going out there

20  and selling pills, but because he had taken his identity and

21  made a mess of it, it just made everything that much more

22  difficult when he came out.  And I'm sure that you know from

23  your own past experience that a lot of times when people leave

24  their -- finish their incarceratory sentences, half the time,

25  they don't even have identity because it's gone during the

20135usaxos

1    course of the arrest and the sentence.  And in this case, his

2    own natural father had actually made things that much more

3    difficult.

4              THE COURT:  Very well.  In deciding what sentence to

5    impose, in addition to the sentencing guidelines and the

6    commentaries thereto, I have considered all the factors set

7    forth in Section 3553(a), including the need for circumstances

8    of the offense and the history and characteristics of the

9    defendant, the need for the sentence imposed to reflect the

10   seriousness of the offense, to promote respect for the law, to

11   provide just punishment, to afford adequate deterrence and to

12   protect the public from future further crimes of the defendant.

13   In having considered those factors and all of the others that

14   are set forth in 3553(a), it is my intention to impose a

15   sentence of 120 months on Count One and 60 months on Count Two

16   to be served concurrently.  Mr. Saxon will thereafter be on

17   supervised release for a period of three years on both Counts

18   One and Two concurrently and will be required to pay a $100

19   special assessment on each count for a total of $200.  I will

20   not impose a fine as I find that Mr. Saxon is unable to pay a

21   fine.

22             I believe that this sentence is sufficient, but not

23   greater than necessary to comply with the purposes of

24   sentencing set forth in Section 3553(a)(2) for the following

25   reasons.

20135usaxos

1    First of all, Mr. Saxon, I have to tell you, despite

2    the arguments that your attorney made, I think that this is a

3    very serious case.  I think that all cases concerning guns are

4    very serious.  And I did find that you had a gun on the night

5    that you were arrested and that you fired the gun.  And in

6    fact, we are very, very lucky, all of us, that the only thing

7    that was hurt were apparently some floors and some walls and a

8    door at that location.  You fired a gun in a very confined

9    space, and how no one was hurt is, in fact, somewhat of a

10   miracle.  So you are very, very lucky that you are only doing

11   ten years in this case and not spending the rest of your time

12   in jail.

13   I did read very carefully the presentence report and

14   the information concerning your background, and it is certainly

15   the case that, for someone like yourself, who had very little

16   by way of an economic opportunity, your father wasn't around,

17   that things were, no doubt, very difficult, and it is not the

18   least bit surprising that someone like yourself would turn to a

19   life of crime.  However, your crimes were serious and they were

20   violent, and, for that reason, I think that, in your particular

21   case, the career offender enhancement is appropriate, which is

22   why I am not going to take Ms. Attias' recommendation and

23   sentence you as though you were not a career offender.  And the

24   fact that, in this case, you very recklessly and, in an

25   intoxicated state, took a gun into a very serious situation I

20135usaxos

1  think enforces the observation that Mr. Gerber makes and that I
2  take very seriously that not only did you continue to go back
3  to committing crimes, but you went back to committing crimes
4  that put people at risk. However, because of the difficulties
5  that you encountered in your life and some of the reasons that
6  perhaps you committed some of these crimes, I think that some
7  benefit should be given to you.

8       By the way, I disagree completely with Ms. Attias' and
9  your telling me or attempting to justify this somehow by saying
10 that the jobs that you had paid relatively little. To the
11 extent that you had decent, honest work, you know, that's what
12 a lot of people make do with. That's what a lot of people live
13 on. That's what a lot of people raise their children on and
14 pay their rent. And they don't commit crimes and they don't
15 hurt people in the way that you were doing.

16      Notwithstanding that, however, I do think that ten
17 years in this case is sufficient, but not greater than
18 necessary to respond to the requirements of the sentencing
19 statutes.

20      Does counsel know of any legal reason, other than
21 what's already been argued, as to why the sentence should not
22 be imposed as stated?

23      MR. GERBER: No, your Honor.

24      MS. ATTIAS: No, Judge.

25      I do want to say that Mr. Saxon is asking to speak to

20135usaxos

1   you one more time before you finish here today.

2           THE COURT:  Does he want to speak now?

3           THE DEFENDANT:  Only I'm begging you.  Please.  Like I

4   apologize for what happened.  I did not have no gun.  I was the

5   one attacked.  They told me that -- to cop out to the pills,

6   they wasn't gonna use the gun.  I didn't have no gun.  I was

7   attacked.  I did not have no gun that night.  I did not shoot

8   nobody.  I did not shoot at nobody.  I told them I'm innocent

9   from the beginning.  From the time they arrested me, I told

10  them I had no gun.  I did none of that.  I made a mistake.  I

11  went out there.  I had pills.  I had a call.  I went out there.

12  And I was drunk.  And when I went out there, my intention was

13  just to get a few dollars.  My girlfriend gave me $20, and it

14  wasn't enough to last me until I see her again.

15          I was trying to get more jobs.  They kept telling me

16  that we don't have no work right now, so I went out there to

17  get a few dollars.  But I had no gun.  I didn't shoot nobody.

18  All the crimes, everything, I admit to.  I took the weight for

19  it.  I didn't have no gun.  I had no gun.  I didn't shoot

20  nobody.  They attack me from the time I went inside the house.

21  They grab me.  They grab me and they push me up against this

22  thing.

23          I didn't have no gun at all.  I didn't have no gun.  I

24  didn't possess no gun.  I was in Yonkers the whole time.  When

25  I came back up to Middletown, I got a call.  I did not have no

20135usaxos

1  gun at all.  I did not leave that house -- no guns.  No guns in
2  my aunt's house.  My aunt works.  The kids go to school.
3  Nobody has no guns, no nothing, in that house.  I didn't have
4  no gun.  I didn't leave from church with no gun to come back up
5  to Yonkers.  I didn't have no gun at all that night.  I made a
6  mistake and picked the wrong thing to pick up some pills to get
7  some extra money.  Like I'm sorry.  I apologize.  But I'm
8  asking you for mercy.  Ten years.  I just did ten years.  I'm
9  asking you please to have mercy and please can you just give me
10  like a little less time.  I apologize to the Court.  Everybody.

11          I did not have no gun.  And it's not fair because they
12  sat there and told me and waited 'till I sat there and gave
13  them information about pills, and then they switched the whole
14  thing and said, oh, we're going to give you a two-point
15  enhancement, we're going to mention this at sentencing.  I
16  wouldn't have -- I wouldn't have even had said nothing about
17  anything if I could -- my whole intention was to go to trial.
18  From the time I got arrested, I said I got robbed.  I didn't
19  have no gun.  I told them at a Fatico.  I tell them at a
20  innocent proffer.  I told her when she asked me to snitch on
21  these people and tell them the whole -- I'm like, no, I'm not
22  telling on nobody.  I'm going to trial.  I didn't have no gun.

23          Right before trial, they come with this offer of
24  (B)(1)(b).  I didn't even know what a (b)(1)(B) was.  But being
25  that I heard everybody talking about a (b)(1)(C), I said, nah,

20135usaxos

1 | I'll take a (b)(1)(C) 'cause I knew that's something lower.
2 | She said it's not going to happen.  Next thing you know, they
3 | saying, yo, we'll drop the gun if you cop out to these pills.
4 | I'm, all right, fine.  Then they said they gonna throw in the
5 | gun.  They say they not gonna do a whole bunch of stuff, and
6 | they did it anyway.  They told me that, yo, listen, you cop out
7 | to this and see what happen.  They went and talked to somebody
8 | and said, oh, yeah, we're going to accept it, but we're going
9 | to give you a two-point enhancement.  The whole beginning, you
10 | said you wasn't gonna use the gun against me, period.  I simply
11 | ask her are they going to use the -- are they gonna try
12 | something different or they gonna wait 'till I give them
13 | information to try to use it against me?  She said no, that's
14 | not how things work.  They turn around and did it.  They both
15 | said, oh, we didn't know they was gonna do that.

16 | I wouldn't have copped out.  I wouldn't have said -- I
17 | wouldn't -- I would've just went to trial.  Don't make no
18 | sense.  I did not have a gun.  I went for the pills.  I'm sorry
19 | about that.  I'm asking you to please have mercy.  I just did
20 | ten years.  I'm trying to get my life back together.

21 | THE COURT:  Well, Mr. Saxon -- I don't know, Ms.
22 | Attias, whether you have an application you wish to make based
23 | on what's just been said.

24 | MS. ATTIAS:  No, Judge.

25 | There was a point, if you will remember, a few months

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

20135usaxos

1   ago when we were in here, Mr. Saxon had considered asking to

2   withdraw his guilty plea. I met with him in the jail. I spoke

3   to Mr. Gerber. We actually came into court and, on that day, I

4   met with him downstairs and spoke to him again, and he told me

5   that he had changed his mind, he did not wish to withdraw his

6   plea. And I just want to say that part of that was because he

7   was looking at a 15-year mandatory minimum, which was -- he

8   always knew that you could go all the way up through the top of

9   the guidelines, and he knew that I was going to be asking for

10  the range that I asked for, and he knew that the trial could go

11  either way. We could have won. We could have lost. And with

12  your Honor's decision on the hearing, frankly, it gives me an

13  indication of what a jury might have thought. And he knew that

14  he was going to be looking at a 15-year minimum. I am not

15  hearing any basis -- he is not saying anything that gives me

16  the feeling that I can truly ask you, based on any legal

17  grounds, for his plea back, so I am not making that motion.

18          THE COURT: Very well.

19          Mr. Gerber.

20          MR. GERBER: Your Honor, I just want to make clear on

21  the record the defendant signed a plea agreement. That plea

22  agreement expressly states that -- there's a paragraph -- let

23  me just -- if I may have one moment, your Honor, just to pull

24  that out.

25          In the plea agreement that the defendant signed, on

20135usaxos

1    page 3, paragraph 8, it expressly states that the parties

2    disagree as to whether the defendant possessed a firearm on the

3    night in question and that there is a dispute regarding whether

4    the two-point level increase is appropriate.  Each party

5    reserves the right to argue that he did or did not possess the

6    firearm.  That was expressly in the plea agreement.

7            There was, frankly, extensive discussion with the

8    defendant and the defendant's counsel regarding this provision.

9    The defendant and defense counsel were quite aware of this

10   provision.  And I would also point out that this provision

11   addresses a two-level increase at issue here.  That actually

12   doesn't affect the guidelines calculation in this case at all.

13           Even if -- even if -- that provision had not been in

14   the plea agreement, which it was, but even if it had not been,

15   under 3553(a), this Court is permitted to consider anything

16   regarding the defendant's history and characteristics.  There

17   is language in our plea agreements, standard language, that

18   says that, within the stipulated guidelines range, the parties

19   are allowed to make arguments, bring to the Court's attention

20   anything that bears on where the Court should sentence within

21   that guidelines range.

22           For the defendant to say now, after having signed this

23   agreement, discussing it with the government, discussing it

24   with defense counsel and, moreover, when the defendant,

25   apparently, at one point was considering trying to -- asking to

20135usaxos

1    withdraw his plea agreement and then, I believe on the record,

2    there was a record from defense counsel that he had

3    affirmatively decided he did not want to withdraw his plea, for

4    the defendant to say now that -- I take it that he's -- in

5    fact, he's not happy with the plea agreement that he entered

6    into, that he really wants to go to trial, you know, obviously,

7    he's saying that because of the sentence that was imposed, and

8    that is not a ground for a defendant to withdraw his plea.

9              THE COURT:  Thank you.

10             And again, I don't involve myself in plea

11   negotiations, and I really wasn't asking for a recitation of

12   those negotiations from the parties.  I just really wanted to

13   know whether there were any applications that would be made in

14   light of Mr. Saxon' comments.

15             And Mr. Saxon, the only thing that I will tell you in

16   addition to what I indicated in my decision on the Fatico is I

17   don't know what else you would have wanted to put in, if

18   anything.  I mean, I thought that you put in all the

19   information, all the evidence that you had.  I saw videotape.

20   I listened to your testimony.

21             And quite frankly, your theory of -- or the theory

22   that was presented to me about what happened in the apartment

23   that night on the part of the defense was inherently

24   preposterous.  It just seemed incredible to me that those

25   individuals who robbed you would then turn around, having taken

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

20135usaxos

1   the gun from you, having overpowered you and called 911 and

2   invited the police to come into the apartment the way that they

3   did knowing, first of all, that they had just robbed you and,

4   more importantly and more pertinent to my mind that each of

5   them, so far as I've been told, was an illegal immigrant and

6   subject to be deported from the country.  So the theory that

7   was presented, to my mind, was absolutely implausible.  I don't

8   know what a jury would have done, but I'm telling you that I

9   believe that you received a full hearing on whether or not

10  there was a gun in that apartment, who had the gun in the

11  apartment, who fired the gun.

12          And with that, it is the judgment of this Court that

13  you be committed to the custody of the Bureau of Prisons for

14  120 months on Count One and 60 months on Count Two to be served

15  concurrently.  That will be followed by three years of

16  supervised release on both Counts One and Two to run

17  concurrently.  And you will be required to pay a $100 special

18  assessment on each count of conviction for a total of $200.

19          I will not impose a fine.  I find that Mr. Saxon is

20  unable to pay a fine.

21          Is there a forfeiture order in this case?

22          MR. GERBER:  No, your Honor.

23          THE COURT:  I will also impose the standard conditions

24  of supervised release numbers 1 through 13 and the mandatory

25  and special conditions that are detailed in the presentence

20135usaxos

1    report.

2              Are there any open counts?

3              MR. GERBER:  Yes, your Honor.  The sole count of the

4    initial indictment, which the government would ask that the

5    Court dismiss.

6              THE COURT:  Very well.  That application is granted.

7              Also, I will not impose any restitution as I find that

8    restitution is not applicable in this case.

9              That constitutes the sentence of the Court.

10             Mr. Saxon, I believe that you've waived your right to

11   appeal a sentence at or below the stipulated range.  Your

12   sentence is below the stipulated range.  However, you may have

13   some limited basis to appeal.  And there are very strict time

14   limits by which you must file your notice of intent to appeal.

15             Ms. Attias, will you assure me that you will promptly

16   and thoroughly discuss with Mr. Saxon such appellate right as

17   he might yet have and that you will do so promptly?

18             MS. ATTIAS:  Yes, I will, Judge.

19             And there's just one other thing.  I would ask you to

20   consider recommending the Bureau of Prisons designate Mr. Saxon

21   as close to home as possible because he has a child that is

22   just a few months old and maybe, this way, they can establish

23   some relationship as she gets older.

24             THE COURT:  I will make that recommendation.

25             MS. ATTIAS:  Thank you.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

20135usaxos

1          THE COURT:  Are there any other applications?

2          MR. GERBER:  No, your Honor.

3          MS. ATTIAS:  No, Judge.

4          THE COURT:  We're adjourned.

5                         -  -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25