UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

TORRELL SAXON,

                                              :      13 Civ. 4966 (ER)

                         Petitioner,      14 Civ. 733 (ER)

                                              :

          - v. -

                                              :

UNITED STATES OF AMERICA,

                                            :

                         Respondent.

                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S
SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT HIS
SENTENCE PURSUANT TO 28 U.S.C. § 2255**

                                                PREET BHARARA
                                                United States Attorney for the
                                                Southern District of New York

Michael Gerber
Assistant United States Attorney
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF FACTS ................................................................................... 1

ARGUMENT ........................................................................................................ 5

    A.    Applicable Law ..................................................................................... 5

        1.    Ineffective Assistance of Counsel ............................................ 5

        2.    The Armed Career Criminal Act............................................... 6

        3.    The Drug Law Reform Act of 2009........................................... 7

    B.    Discussion ........................................................................................... 9

        1.    Saxon Was Properly Charged Under ACCA ............................ 9

        2.    Trial Counsel Was Not Ineffective ........................................ 19

        3.    There Was No Prejudice ......................................................... 21

CONCLUSION................................................................................................... 25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in response to the supplemental motion filed by petitioner Torrell Saxon for relief pursuant to Title 28, United States Code, Section 2255. The supplemental motion contends that Saxon was denied his Sixth Amendment right to counsel because his attorney failed to argue that he was not subject to a fifteen year mandatory minimum sentence under Title 18, United States Code, Section 924(e), also known as the Armed Career Criminal Act ("ACCA").

As set forth below, Saxon's ACCA claim is meritless, and the fact that trial counsel did not raise the claim was no error at all, let alone one of constitutional proportions. In any event, even if Saxon had prevailed on the ACCA claim, he still would have faced far in excess of 15 years' imprisonment, and the ultimate outcome of this case would have been no different. For both these reasons, the petition should be denied without a hearing.

## STATEMENT OF FACTS

The Government described the relevant facts in response to Saxon's *pro se* papers. Below is a condensed version of those facts, to provide context for the arguments to follow.

Saxon was arrested by police officers on or about the early morning of March 25, 2012 at a residence on North Street in Middletown, New York (the "Residence"). On April 23, 2012, a Grand Jury sitting in this District returned Indictment 12 Cr. 320 (the "Indictment"). Exhibit ("Ex.") A. The Indictment charged Saxon with possessing a firearm after having three previous convictions for a violent felony or a serious drug offense, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Two of those convictions were for robbery in the first degree; the third was a 1996 conviction for criminal sale of a controlled substance in the third degree, a Class B felony. The charge in the Indictment carried a mandatory minimum sentence of 180 months' imprisonment.

The Government's theory—borne out at a *Fatico* hearing, discussed below—was that Saxon had entered the Residence, pointed a gun at the head of Rodrigo Perez-Suarez, a guest in the Residence, and fired the gun at Juan Moreira, who lived at the Residence. Perez-Suarez, Moreira, and other individuals at the Residence were able to subdue Saxon, and Perez-Suarez called 911. The police arrived, recovered the gun, and took Saxon into custody.

On August 27, 2012, Saxon and his trial counsel met with the Government, and Saxon offered an account of his actions on the evening of March 24 and the morning of March 25 (the "Innocence Proffer"). Saxon's account was offered pursuant to an agreement between the Government and Saxon, dated August 27, 2012. Ex. B (the "Innocence Proffer Agreement"). As relevant here, Saxon admitted that he had been selling Oxycodone pills, but denied possessing the firearm at the Residence.

On December 21, 2013, Saxon pled guilty to a superseding information, Ex. C (the "Superseding Information"), pursuant to a plea agreement dated that same day, Ex. D (the "Plea Agreement"). The Superseding Information charged Saxon in two counts. The first count, based on his statements at the Innocence Proffer, charged him with distributing and possessing with intent to distribute Oxycodone. Ex. C at 1. The second count, based on a then-pending state court case against Saxon, charged him with distributing and possessing with intent to distribute Alprazolam and Clonazepam. Ex. C at 1-2.

The charges in the Superseding Information contained no mandatory minimum sentence. The Plea Agreement stipulated that, because of Saxon's career offender status pursuant to U.S.S.G. § 4B1.1, his Guidelines range was 151 to 188 months' imprisonment. Ex. D at 3-4. In the Plea Agreement, the Government reserved the right to argue that Saxon possessed a firearm on March 25, 2012, while Saxon reserved the right to argue that he had not possessed the

firearm.  Ex. D at 3.  Because Saxon's offense level as a career offender was higher than the

offense level calculated for Counts One and Two of the Superseding Information, his offense

level was 29 and the Guidelines range was 151 to 188 months' imprisonment, irrespective of

whether Saxon possessed the gun that night.  Ex. D at 3; U.S.S.G. § 4B1.1(b)(3).[1]

      At Saxon's guilty plea allocution, Ex. E, he acknowledged under oath, among other

things, that he had a full and fair opportunity to discuss his case and the consequences of entering

a guilty plea with counsel, and that he was satisfied with counsel and her representation of him,

Ex. E at 5; that if he was unhappy with his sentence, he would still be bound by his guilty plea

and would not be permitted to withdraw his guilty plea, Ex. E at 17-18, that he had signed the

Plea Agreement, discussed every aspect of it with counsel, and fully understood it, Ex. E at 18;

and that no one had made any promises as to what his sentence would be, Ex. E at 19.

      On April 9, 2013, Saxon appeared before the Court for a conference.  He stated that he

had wanted to withdraw his plea, but now did not wish to do so.  Ex. F.  On April 17 and April

23, 2013, the Court held a *Fatico* hearing with respect to Saxon's possession of the firearm.  Exs.

G and H.  The Government offered testimony from Juan Moreira, who described how Saxon shot

at him and how he and others ultimately subdued Saxon, and from a firearms and tool mark

identification expert, who testified regarding the tool mark evidence at the Residence.  The

Government also played the 911 call from the Residence on the morning of March 25, 2012.

The defense offered testimony from an expert in criminalistics; an officer who responded to the

Residence following the 911 call; and the officer who collected crime scene evidence at the

---

[1] The Plea Agreement states that Saxon will not "bring a collateral challenge . . . under Title 28,
United States Code, Section 2255 . . . of any sentence within or below the Stipulated Guidelines
Range of 151 to 188 months' imprisonment."  Ex. D at 5.  Here, the Court imposed a sentence of
less than 151 months' imprisonment.  However, pursuant to a subsequent change to Department
of Justice policy, the Government is not relying on this waiver to bar the defendant from raising
an ineffective assistance of counsel claim.

3

Residence.  In addition, Saxon testified at length, claiming that he had been attacked and robbed by individuals at the Residence and that he had not possessed or discharged a gun.

The Court imposed sentence on May 30, 2013.  Ex. I.  The Court first concluded that, based on the evidence presented at the *Fatico* hearing, the defendant had possessed and discharged the firearm. Ex. I at 2-6.  The Court then determined that the defendant's Guidelines range—consistent with the Plea Agreement and the PSR—was 151 to 188 months' imprisonment.  Ex I at 8.  The Court imposed a below-Guidelines sentence of 120 months.  Ex. I at 22.  The Court observed that the notion that Saxon had been robbed by the individuals at the Residence "was inherently preposterous."  Ex. I at 30.  The Court also stated that "I don't know what a jury would have done, but I'm telling you that I believe that you received a full hearing on whether or not there was a gun in that apartment, who had the gun in the apartment, who fired the gun."  Ex. I at 31.  The judgment was entered on July 25, 2013.

On September 3, 2015, Saxon filed the instant supplemental motion.  According to Saxon, his Class B drug felony does not qualify as a "serious drug offense" under ACCA, and therefore he was not subject to a fifteen year mandatory minimum sentence as a result of his possession of a firearm.  Saxon acknowledges that at the time of his conviction for the Class B felony, the statutory maximum sentence was more than 10 years' imprisonment, and the offense therefore constituted an ACCA predicate.  Petitioner's Supplemental Brief ("Br.") 9.  However, Saxon contends that because certain defendants convicted of a Class B drug felony can apply to receive a reduced statutory maximum sentence of 9 years, he should obtain the benefit of that reduction as well.  Br. 10.  Saxon argues that his trial counsel's failure to raise this claim constituted ineffective assistance.  Br. 13-14.  Saxon further argues that, had counsel raised this claim, he would have prevailed, not pled guilty, and gone to trial.  Br. 15-19.

4

## ARGUMENT

**A.     Applicable Law**

1.      Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel fails unless a petitioner (i) overcomes a "strong presumption" that his counsel's conduct was reasonable and shows that her representation "fell below an objective standard of reasonableness" under "prevailing professional norms"; and (ii) "affirmatively prove[s] prejudice," that is, shows that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington*, 466 U.S.  668, 687-88, 693-94 (1984).  The burden is on the petitioner to establish both elements. *Id.*  at 687.

Under the first prong of *Strickland*, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that [t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way." *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (internal quotation marks omitted).  A petitioner must show "'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the Petitioner by the Sixth Amendment.'"  *Harrington* v. *Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S.  at 687).

Under the second prong, a petitioner must meet the "heavy burden" of showing "actual prejudice." *Strickland*, 466 U.S.  at 692.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 693).  And "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. The reviewing court must assess "whether, absent counsel's deficient performance, there is a

5

reasonable probability that the outcome of the proceeding would have been different." *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994).  That is, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 792 ("[T]he difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case."  (internal quotation marks omitted)); *see also Lockhart* v. *Fretwell*, 506 U.S. 364, 372 (1993) ("[T]he prejudice component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.").

### 2.   The Armed Career Criminal Act

A felon who possesses a firearm is subject to a fifteen year mandatory minimum sentence if he has three prior convictions for a "violent felony" or a "serious drug offense."  18 U.S.C. § 924(e)(1).  A serious drug offense is "an offense under State law, involving manufacturing, distributing, possessing with intent to distribute a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law."  18 U.S.C. § 924(e)(2)(A)(ii).

In *United States* v. *McNeill*, 131 S. Ct. 2218 (2011), the Supreme Court held that the maximum sentence "prescribed by law" must be "determined according to the law applicable" at the time the defendant was convicted for the predicate drug offense, rather than at the time when the defendant is charged with unlawfully possessing a firearm.  *Id.* at 2222.  The Court noted in a footnote that "this case does not concern a situation in which a State subsequently lowers the maximum penalty applicable to an offense and makes that reduction available to defendants previously convicted and sentenced for that offense."  *Id.* at 2224 n.1.  The Court emphasized that it was not "address[ing] whether or under what circumstances a federal court could consider the effect of that state action."  *Id.*

3.    The Drug Law Reform Act of 2009

At the time of Saxon's Class B drug felony conviction, the maximum term of imprisonment for that offense was 25 years.  Beginning in 2004, New York enacted a series of Drug Law Reform Acts ("DLRAs"), which, among other things, reduced the maximum sentence for a Class B drug felony to 9 years.  The 2009 DLRA allows certain Class B drug offenders to "apply to be resentenced to a determinate sentence" under the revised sentencing scheme. CPL § 440.46(1).  In order to be eligible for resentencing, a defendant must have committed the offense prior to January 13, 2005 and have received an indeterminate sentence with a maximum term of more than three years.  CPL § 440.46(1).  The defendant must also be incarcerated or on parole for that Class B offense. *See People* v. *Brown*, 25 N.Y.3d 247, 249-51 (2015).

The 2009 DLRA further provides that "the provisions of section twenty-three of chapter seven hundred thirty-eight of the laws of 2004" govern a motion for resentencing.[2]  CPL § 440.46(3).  That section states that the application for resentencing "shall be referred for determination to the judge or justice who imposed the original sentence upon such person." Ex. J at 1474.  The trial court is initially to consider whether the defendant is eligible for resentencing; if he or she is ineligible, the court must issue an order denying the application. *Id.* at 1475.  If the court finds that the defendant is eligible for resentencing, the court "may consider any facts or circumstances relevant to the imposition of a new sentence which are submitted by such person or the people." *Id.*  As part of its factfinding, "[t]he court shall offer an opportunity for a hearing and bring the applicant before it." *Id.*  It may also "conduct a hearing, if necessary, to determine whether such person qualifies to be resentenced or to determine any controverted issue of fact relevant to the issue of sentencing." *Id.*

---

[2] This is a cross-reference to the procedures used for the 2004 DLRA, which provided resentencing opportunities to certain defendants convicted of Class A–I drug felonies.  Because these provisions are not codified in the New York Code, they are provided here as Exhibit J.

Following "its review of the submissions and the findings of fact made in connection with the application," *id.*, the court must determine whether to grant or deny the application for resentencing.  "A defendant who is eligible for resentencing pursuant to CPL 440.46 enjoys a statutory presumption in favor of resentencing." *People* v. *Duke*, 2015 WL 6160647, at *1 (2d Dep't Oct. 21, 2015).  However, if "substantial justice dictates that the application should be denied," then the court "shall issue an order denying the application." Ex. J at 1475.  *See People* v. *Sosa*, 18 N.Y.3d 436, 443 (2012) ("To the extent that the legislature's definition of the eligible class in the individual case proves over-inclusive, the proper corrective is achieved by means of the statutorily required exercise of judicial discretion to determine whether relief to an eligible application is in the end consonant with the dictates of substantial justice.").  Accordingly, "[r]esentencing is not automatic, and courts may deny the applications of persons who have shown by their conduct that they do not deserve relief from their sentences." *People* v. *Rodriguez*, 116 A.D.3d 639, 639 (1st Dep't Apr. 29, 2014) (internal quotation marks omitted); *Duke*, 2015 WL 6160647, at *1 ("[R]esentencing is not automatic, and the determination is left to the discretion of the Supreme Court."  (internal quotation marks omitted)).

"[I]n determining whether substantial justice dictates the denial of a resentencing application, it is proper to consider the totality of the circumstances, including the nature and seriousness of the offense for which the defendant was convicted, the defendant's conduct post-sentence, and his or her criminal and institutional record." *People* v. *Ford*, 103 A.D.3d 492, 492 (1st Dep't 2013) (affirming denial of application for resentencing in light of defendant's extensive criminal record, use of aliases and different dates of birth, history of recidivism, and parole violations).  The 2009 DLRA requires the court to consider the defendant's disciplinary history while incarcerated.  CPL § 440.46(3); *see Brown*, 2010 WL 9928, at *8 ("Courts in other

8

resentencing applications applying the 'substantial justice dictates' standard under the 2004 and

2005 DLRAs have concluded that disciplinary histories like Defendant's here, or even less

significant disciplinary records, warranted denial of resentencing motions." ).[3]  In the event that

the trial court chooses to grant the application and resentences the defendant, it must issue a

written order justifying its decision.  Ex. J at 1475.

**B.    Discussion**

      1.    <u>Saxon Was Properly Charged Under ACCA</u>

Saxon was properly charged under ACCA.  When he was convicted of a Class B drug

felony in 1996, his statutory maximum was 25 years.  That has not changed.  Saxon is ineligible

for resentencing under the 2009 DLRA, and even if he were eligible for resentencing, his

application would almost certainly be denied in the interest of substantial justice.

      There can be no dispute that Saxon is ineligible for resentencing.  His sentence was not in

excess of three years, and he is no longer serving that sentence, whether in prison or on parole.

*See* CPL § 440.46(1).  Under the 2009 DLRA, that does not mean merely that Saxon cannot

---

[3] A defendant who was convicted of a violent felony prior to the Class B drug felony is *per se* ineligible for resentencing.  *See* CPL § 440.46(5).  "The statutory language . . . indicates that this portion of CPL 440.46 was not written to anticipate the situation where the offense was committed after the drug conviction, such as while the defendant was out on parole or work release."  *People* v. *Cristostomo*, 95 A.D.3d 401, 402 (1st Dep't 2012).  This is hardly surprising, given that when the 2009 DLRA was initially enacted it only applied to a defendant who was still incarcerated for his or her Class B offense.  A 2011 amendment to the statute broadened its scope to include defendants on parole for a Class B drug conviction.  *See People* v. *Brown*, 25 N.Y.3d 247, 251 (2015).  In any event, the Court of Appeals has pointed to CPL § 440.46(5) to demonstrate "the legislature's evident conclusion that the violent nature of an offender's misconduct should render him or her ineligible for resentencing."  *People* v. *Coleman*, 24 N.Y.3d 114, 123 (2014).  As set forth below, courts regularly exercise their discretion to deny resentencing applications from defendants who committed violent offenses subsequent to their Class B conviction.  *See, e.g.*, *People* v. *Golo*, 109 A.D. 3d 623, 623-24 (2d Dep't 2013) (holding that defendant's convictions for robbery in the first degree did not render him ineligible for resentencing because he "was convicted and sentenced on the robbery convictions after he was convicted and sentenced on the present drug offense," but affirming the denial of his application on substantial justice grounds, in part because of those robbery convictions).

benefit from the reduced statutory maximum; it means that his statutory maximum has not been reduced at all.  Even for those Class B offenders (unlike Saxon) who can apply for resentencing under the statute, *the statutory maximum is not changed until after the trial court has found that a resentencing is in the interest of substantial justice*.

This must be so because of cases where defendants received sentences for Class B drug convictions that were in excess of 9 years; they were eligible for resentencing; yet their applications were denied in the discretion of the trial court.  For example, in *People* v. *Davis*, 128 A.D.3d 1269 (3d Dep't 2015), the defendant was convicted in 2002 of a Class B drug felony and sentenced to 8 to 16 years' imprisonment.  In 2012, he applied to be resentenced.  The defendant was eligible for resentencing; nevertheless, the court denied the application because of the defendant's history of felony convictions and parole violations.  *Id.* at 1270.  Likewise, in *People* v. *Brown*, 2010 WL 9928 (N.Y. Sup. Jan. 4, 2010), the court found that the defendant, who had been sentenced to 8 to 16 years' imprisonment for a Class B drug felony was eligible for resentencing, but that substantial justice dictated the denial of his application.  *Id.* at *7-9. The Appellate Division affirmed, reasoning that "[d]efendant's criminal history and prison disciplinary record were both very extensive and included violent conduct."  *People* v. *Brown*, 84 A.D.3d 586, 586 (1st Dep't 2011).

In cases such as *Davis* and *Brown*, the defendants were eligible for resentencing, and yet they remain in prison, serving sentences in excess of what is now the nine year statutory maximum.  That does not mean they are serving unlawful sentences.  It means that their statutory maximum sentence was not reduced.  In other words, unless and until a state court finds, in the exercise of its discretion, that a defendant should receive a reduced statutory maximum, the maximum sentence for that defendant remains 25 years.

10

Even if Saxon were eligible for resentencing under the 2009 DLRA (which he is not), the odds that a New York court would reduce his statutory maximum are close to zero.  His criminal history is a harrowing tale of recidivism and violence.  In 1994, he was adjudicated a youthful offender for committing robbery in the second degree:  He struck a woman in the back of the head and demanded her property at gunpoint.  While on probation for that offense, he arranged for the sale of heroin to an undercover police officer.  This resulted in his Class B drug felony conviction in 1996 and a sentence of 1 to 3 years' imprisonment.  While incarcerated on the Class B felony, he received 19 disciplinary infractions, of which 8 were Tier III, the highest and most serious level.  The infractions included acts of violence.  Ex. K (Department of Corrections disciplinary history, 1996-1999).  Saxon completed his sentence in August 1999.  Just a few months later, in December 1999, he committed two violent knifepoint robberies over the course of two days, and was sentenced to 8 years' imprisonment.  While in prison for those robberies, Saxon received 30 disciplinary infractions, of which 13 were Tier III; again, there were multiple acts of violence.  Ex. L (Department of Corrections disciplinary history, 2001-2009).[4]  On September 30, 2002, Saxon was caught with a shank in prison; he pled guilty to attempted possession of dangerous contraband in prison and was sentenced to 18 months' to 3 years' imprisonment.  A state court considering a hypothetical application by Saxon for resentencing would also hear evidence that he sold pills to an undercover police officer in August 2010, that he was found with 15 envelopes of heroin in August 2011, and that he shot at Juan Moreira in March 2012.

Given this history, Saxon almost surely would be denied resentencing on substantial

---

[4] The disciplinary histories refer to "Tyrell Saxon" and "Donelle Green."  These names, and the inmate identification numbers associated with the disciplinary histories, correspond to the names and identification numbers listed in Saxon's criminal history.

justice grounds. *See People* v. *Cerza*, 85 A.D.3d 810, 811 (2d Dep't 2011) (explaining that the 2009 DLRA is structured to "prevent[ ] those inmates who repeatedly violate New York's criminal laws from availing themselves of the ameliorative effect of CPL 440.46" (internal quotation marks omitted)). In fact, defendants with histories nowhere near as bad have seen their resentencing motions rejected.[5] And the courts have been particularly vigilant to deny resentencing to those defendants—like Saxon—who repeatedly engaged in violence subsequent to their conviction for the Class B offense.[6] It is not just that Saxon's statutory maximum has

---

[5] *See, e.g.*, *Duke*, 2015 WL 6160647, at *1 (resentencing motion properly denied given "the defendant's extensive and continuous criminal history, dating back to 1981, his multiple parole violations, and his poor institutional record, which consisted of 13 Tier III infractions and 16 Tier II infractions"); *People* v. *Lopez*, 103 A.D.3d 460, 460 (1st Dep't 2013) ("The court properly exercised its discretion in concluding that substantial justice dictated denial of resentencing, given defendant's very extensive history of felony convictions and parole violations, and his use of narcotics while in prison."); *People* v. *Cabrera*, 103 A.D.3d 748, 748-49 (2d Dep't 2013) (affirming denial of motion "in light of the defendant's extensive criminal history, pattern of committing crimes while on parole, and institutional record, which included 22 infractions, 8 of which were tier III infractions"); *People* v. *Arroyo*, 99 A.D.3d 515, 516 (1st Dep't 2012) ("Given defendant's criminal record, involving two felony convictions subsequent to the convictions for which he seeks resentencing (one occurring while he was on parole), and his poor infraction history (eight tier II and seven tier III infractions), the motion court, in the exercise of its discretion, properly denied defendant's application for resentencing.").

[6] *See, e.g.*, *People* v. *Moore*, 115 A.D.3d 990, 990-91 (2d Dep't 2014) (affirming the denial of defendant's motion for resentencing because of "the defendant's extensive and continuous criminal history, dating back to 1988, his commission of violent felonies, including those committed after committing the instant offense, his commission of further drug offenses upon his release to parole in connection with the instant offense, and his disciplinary record while incarcerated, which included possession of unauthorized pills and violent conduct toward a corrections officer."); *People* v. *Golo*, 109 A.D. 3d 623, 624 (2d Dep't 2013) (affirming denial of defendant's motion "in light of the defendant's criminal history, convictions of robbery in the first degree, parole violations, and institutional record of confinement"); *People* v. *Devivo*, 87 A.D.3d 794, 796 (3d Dep't 2011) ("[E]specially given that defendant was convicted of a violent felony offense after committing the crime for which he seeks resentencing, we agree that substantial justice dictates that the application be denied."); *People* v. *Myles*, 90 A.D.3d 952, 954 (2d Dep't 2011) (motion to be resentenced properly denied "in light of the defendant's criminal history and his institutional record of confinement, which included 12 tier III and 21 tier II disciplinary infractions for, among other things, fighting, violent conduct, drug use, and sexual offenses, and considering that the defendant was convicted of criminal sexual act in the third degree after his conviction of the drug offense for which he seeks resentencing"); *People* v.

not been reduced and that it never could be reduced under the current law; even if he were

eligible, he is precisely the type of defendant who is not supposed to have his statutory maximum

reduced.  *See Brown,* 2010 WL 9928, at *8 ("The resentencing provisions of the 2009 DLRA are

obviously ameliorative.  But they also reflect a concern for public safety.  That is a concern

which a court evaluating the resentencing application is bound to carefully consider.").

Accordingly, his Class B felony still carries a maximum sentence of 25 years, as the New York

legislature intended, and he falls squarely within ACCA's compass.

      In his brief, Saxon presents a different view.  He observes that "the DLRAs provided that

Class B offenders who had been sentenced under the old Rockefeller Drug Laws could petition

to be resentenced under the new sentencing scheme."  Br. 10.  He therefore concludes that, "as

provided by *McNeil*, the State had 'made that reduction available to defendants previously

convicted and sentenced for that offense.'"  Br. 10 (quoting *McNeill*, 131 S. Ct. at 2224 n.1).

Saxon does not address the fact that many Class B offenders, himself included, are ineligible for

resentencing.  And he makes no mention of the discretionary analysis that must be conducted by

the trial court before any defendant can qualify for a reduced statutory maximum.  But Saxon's

argument appears to be that because some Class B offenders qualify for resentencing, and

because a subset of those offenders actually have their statutory maximum sentence reduced, for

ACCA purposes *all* Class B offenders sentenced under the Rockefeller Drug Laws should be

deemed to have their statutory maximum sentence reduced.

      That argument is wrong, for several reasons.

      To begin, the argument does violence to the *McNeill* footnote.  That footnote

contemplated a situation in which a state had retroactively reduced the statutory maximum across

---

*Alaouie*, 86 A.D.3d 462, 462 (1st Dep't 2011) ("Uncontested information about defendant's very
serious pattern of violent behavior while incarcerated dictated denial of his motion.").

13

the board, and the defendant had not yet availed himself of that reduction.  And perhaps (though we do not concede this point) the footnote could be read to encompass a situation in which the state retroactively reduced the statutory maximum for all offenders, but for technical or administrative reasons the reduction was unavailable to the defendant (for example, because he was no longer serving his sentence).  At the same time, it makes no sense to say that the two-sentence dictum in *McNeill* was meant to address a sentencing scheme such as the 2009 DLRA, in which trial courts are called upon to make individualized, fact-specific, discretionary determinations as to whether a defendant is entitled to a reduction in his or her statutory maximum.  *See People* v. *Mitchell*, 116 A.D.3d 415, 414 (1st Dep't 2014) ("Resentencing is a discretionary determination.").  And it makes even less sense to suggest that in such a scenario, a defendant who is ineligible for a reduced statutory maximum and who is not intended under state law to receive that reduction, should be treated as though he received it anyway.

In fact, Saxon's argument runs counter to the core holding of *McNeill*.  By Saxon's logic, all Class B drug offenders sentenced under the Rockefeller Drug Laws should be treated, for ACCA purposes, as if their statutory maximum sentence was nine years; nothing in his argument turns on the sentence that a defendant actually received.  So, for example, the *Davis* and *Brown* defendants, who were each eligible for resentencing under the DLRA but were denied discretionary relief, would be deemed under ACCA to have a statutory maximum sentence of nine years, even though they are actually serving terms of imprisonment greater than nine years.  This is precisely the sort of "absurd result[ ]" that the *McNeill* Court sought to preclude. *McNeill*, 131 S. Ct. at 2223; *see id.* at 2222 ("We find it hard to accept the proposition that a defendant may lawfully have been sentenced to a term of imprisonment that exceeds the maximum term of imprisonment prescribed by law."  (internal quotation marks omitted)).

14

Saxon's position also does violence to the 2009 DLRA.  If Saxon is right, then he receives a windfall *because* he is ineligible for resentencing under the statute.  If he were eligible for resentencing, he would have to go through the process called for by the 2009 DLRA.  The trial court would hold a hearing and consider the full scope of his criminal conduct, including his conduct while incarcerated, to determine whether substantial justice justified a reduced statutory maximum.  Because Saxon is ineligible for relief under the 2009 DLRA, he will never go through this process.  But by Saxon's logic, he gets the benefit of resentencing, bypassing the very procedures designed to prevent a violent career criminal like Saxon from obtaining the benefits of the statute.  *See People* v. *Coleman*, 24 N.Y.3d 114, 123 n.1 (2014) ("Although quite a few persistent felony offenders are not low-level offenders deserving of resentencing, a resentencing court may account for that fact by denying a persistent felon's resentencing application on substantial justice grounds where appropriate.").  That cannot be right—whether as a matter of statutory interpretation, common sense, or simple fairness.  *See People* v. *Mills*, 11 N.Y.3d 527, 537 (2008) ("[Defendant]'s argument boils down to the proposition that, solely because he is a repeat offender, he qualified for relief . . . otherwise beyond his reach.  Surely the legislature did not intend fresh crimes to trigger resentencing opportunities.").

And Saxon is not just seeking a procedural windfall; he wants a substantive windfall as well.  The 2009 DLRA was not meant to benefit defendants like Saxon with a history of recidivism and violence. *See Cerza*, 85 A.D.3d at 811; *Brown,* 2010 WL 9928, at *8; *Sosa*, 18 N.Y.3d at 443; *Coleman*, 24 N.Y.3d at 123 n.1; *Paulin*, 17 N.Y.3d at 244.  As set forth above, because of Saxon's extensive and violent criminal history, even if he were eligible for resentencing, there is almost no chance that he would actually be resentenced—on the contrary, case after case suggests that his petition for resentencing would be denied on grounds of

substantial justice.  Yet nevertheless, Saxon claims that he should be treated for ACCA purposes as though he received the benefit the 2009 DLRA was structured to prevent.

Saxon's argument is further foreclosed by the Second Circuit's holding in *Rivera* v. *United States*, 716 F.3d 685 (2d Cir. 2013).  There, the question was whether Rivera's Class C felony drug conviction counted as a serious offense for purposes of ACCA.  At the time Rivera committed that offense, the statutory maximum was 15 years; he received a sentence of one year of imprisonment, which he had completed years earlier.  *Id.* at 686-87.  As a result of the DLRAs, the statutory maximum had subsequently been reduced to 9 years.  *Id.* at 688.  Rivera pointed out that the 2009 DLRA provides that in certain circumstances an individual convicted of a Class C drug felony can apply for resentencing.  Ex. M at 10-15.  In particular, the 2009 DLRA provides that if a defendant has been sentenced at the same time for a Class B drug felony and a Class C drug felony, he can apply for resentencing not only for the Class B offense but for the Class C offense as well. *See* CPL § 440.46(2).  Rivera argued that he should receive the benefit of this sentencing regime, and by Saxon's reasoning this makes good sense:  After all, some Class C offenders could apply for resentencing, even if Rivera could not.  In fact, Rivera had committed a less serious offense (convicted of only a Class C felony) than an individual who could apply for resentencing (convicted of a Class B and a Class C felony).

The Second Circuit disagreed.  It explained that

> [w]hile some provisions of the 2009 DLRA apply retroactively, they do not apply where, as here, a defendant has already been sentenced.  Likewise, as Rivera conceded, the expanded opportunities for resentencing provided by the 2009 DLRA did not apply to a person whose sole drug-related offense was a class C felony.  Viewed collectively, the New York sentencing schemes mirror those addressed in *McNeill* because their provisions do not retroactively change the maximum sentence applicable to Rivera's drug conviction.

*Rivera*, 716 F.3d at 690 (internal quotation marks omitted).  The Second Circuit rejected

Rivera's argument because the opportunities for resentencing under the 2009 DLRA did not apply *in his particular circumstances*.  Because Rivera had already been sentenced, he could not avail himself of certain resentencing provisions.  And because he only had a Class C conviction, not Class B and Class C convictions, the opportunity for resentencing did not benefit him.  That analysis applies foursquare here.  Under *Rivera*, the fact that other Class B offenders can apply for a reduced statutory maximum, and sometimes get it, is of no help to Saxon.

Saxon relies on two decisions in this district, *United States* v. *Jackson*, 2013 WL 4744828 (S.D.N.Y. Sept. 4, 2013), and *United States* v. *Calix*, 2014 WL 2084098 (S.D.N.Y. May 13, 2014).  In *Jackson*, the defendant was charged under ACCA based on three convictions for Class B drug felonies (he had no violent felony convictions).  The court ruled that even though the defendant was ineligible for resentencing under the 2009 DLRA, he was not subject to ACCA in light of the *McNeill* dictum.  *Jackson*, 2013 WL 4744828, at*3-6.  In *Calix*, the defendant was charged under ACCA based on three felony drug convictions, including a Class B drug felony (he too had no violent felony convictions).  The defendant was ineligible for resentencing, but the court ruled that ACCA did not apply.  *Calix*, 2014 WL 2084098, at *12-15.

The fundamental problem with the *Jackson* and *Calix* decisions is that they do not mention, let alone address, the substantial justice analysis called for by the 2009 DLRA. That is probably because, as best the Government can tell, none of the briefs in *Jackson* or *Calix*—not those from defense counsel, and not those from the Government—addressed that component of the statute.  The briefs in those cases leave the impression that if a defendant is eligible for resentencing under the 2009 DLRA, he or she applies for resentencing and that is the end of the matter.  That is not correct.  *See People* v. *Salcedo*, 40 A.D.3d 356, 357 (1st Dep't 2007) ("The Legislature could have made resentencing automatic, or it could have required a finding of

extraordinary circumstances in order to deny resentencing, but it did not do either." (internal

quotation marks omitted)). The Government respectfully submits that the *Jackson* and *Calix*

courts might well have ruled differently if they had been properly briefed by the parties

regarding the 2009 DLRA and the discretionary, individualized assessment mandated by statute.

Not surprisingly, because *Jackson* and *Calix* were based on incomplete information, the

rationale for the decisions cannot be squared with the purpose and structure of the 2009 DLRA.

Both *Jackson* and *Calix* seem to take it as a given that all Class B offenders were the intended

beneficiaries of the 2009 DLRA, even if some of those offenders were technically ineligible for

relief.[7] But in fact, the 2009 DLRA was designed to limit the scope of that relief and ensure that

recidivists, in particular violent recidivists, would not be granted relief under the substantial

justice prong of the statute. The *Jackson* and *Calix* courts do not address this issue, because no

one told the courts how the 2009 DLRA actually works.

Likewise, the *Jackson* and *Calix* courts assume that their respective defendants would

have received the benefit of the 2009 DLRA if only they had not completed their sentences.[8]

But again, eligibility for resentencing is only the first step of a two-step process under the 2009

DLRA. *See People* v. *Brown*, 25 N.Y.3d 247, 251 (N.Y. 2015) ("[A] finding of eligibility is

simply the first step in the resentencing process—the ultimate decision lies in the exercise of

---

[7] *See, e.g.*, *Jackson*, 2013 WL 4744828, at *5 ("Nor does it make sense to apply the ACCA to Jackson, but not to a more recently convicted criminal only because Jackson's conviction is older and his sentence has been served."); *Calix*, 2014 WL 2084098, at *14 ("Even though Calix himself was not eligible for resentencing, this Court finds that Calix, as a class B drug offender whom the 2009 DLRA was intended to benefit, fits within the question left open by *McNeill*.").
[8] *See Jackson*, 2013 WL 4744828, at *5 ("Depriving Jackson of the benefits of the 2009 DLRA's retroactive application because he has already finished serving his previous sentences and cannot apply to be resentenced is the sentencing equivalent of kicking a man when he is down"); *id.* at *6 ("[T]here is no reason for Jackson to be punished more harshly because he was sentenced prior to the 2009 DLRA, as compared to an identical defendant who committed precisely the same crime, but was sentenced after the 2009 DLRA's enactment or one who remained incarcerated and therefore was eligible for resentencing under the 2009 DLRA.").

discretion of the reviewing judge as part of the court's 'substantial justice' determination."). That second, discretionary step goes unaddressed in *Jackson* and *Calix*—and in Saxon's brief.

In short, *Jackson* and *Calix* were addressing a situation in which a state retroactively reduces sentences for an offense, and a defendant is unable to avail himself of that reduction for reasons unrelated to the purpose of the revised sentencing scheme. In that scenario, they concluded, the *McNeill* dictum applies, and for purposes of ACCA the defendant can receive the benefit of the reduction. Whether or not that analysis is correct, the statute they were considering is not the statute that New York enacted. The *Jackson* and *Calix* decisions never grappled with what the 2009 DLRA actually does, and their analysis should not guide this Court.

### 2.   Trial Counsel Was Not Ineffective

Saxon argues that trial counsel assumed that ACCA applied, and never considered the ACCA claim he now advances. The Government concedes as much. But it is black-letter law that failure to make a meritless claim cannot constitute ineffective assistance of counsel. *See United States* v. *Regalado*, 518 F.3d 143, 149 n. 3 (2d Cir. 2008) ("[F]ailure to make a meritless argument does not amount to ineffective assistance."); *United States* v. *Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance."). Because the ACCA claim would have been rejected by this Court, trial counsel's failure to make that claim was not ineffective assistance.[9]

---

[9] Saxon points out that although his Guidelines range pursuant to the Plea Agreement was 151 to 188 months' imprisonment, his lawyer told him that "he could be sentenced to five years, if not less." Br. 5 & n.5. To the extent Saxon is suggesting that this constituted ineffective assistance, he is mistaken. Counsel expressly told Saxon in a call prior to his guilty plea that she did not know what sentence he would receive "because the judge is the one that sentences you." 12/19/12 Call. And later in that call she reiterated: "[C]ould he give you Guidelines? Yes." 12/19/12 Call. At his guilty plea on December 21, 2012, Saxon stated under oath that he understood that only the Court would decide his sentence, that no one could give him any assurance of what his sentence would be, and that his sentence could be different from what was in the plea agreement or what anyone had told him his sentence might be. Ex. 17-18. Moreover,

Even if this Court adopts Saxon's ACCA claim, at the time of his plea and sentencing this was a novel argument.  In *McNeill*, the Supreme Court had stated in pithy, cryptic dictum, that it was *not* addressing a situation in which "a State subsequently lowers the maximum penalty applicable to an offense and makes that reduction available to defendants previously convicted and sentenced for that offense."  *McNeill*, 131 S. Ct. at 2224 n.1.  *Jackson* and *Calix* had not been decided, and there was no law, anywhere, suggesting that a defendant like Saxon (ineligible for resentencing under the 2009 DLRA, and a violent career criminal to boot) could benefit from the 2009 DLRA in an ACCA case.  While Saxon suggests that his ACCA claim is a straightforward application of the *McNeill* dictum, this is not so:  At best, Saxon's attempt to squeeze the 2009 DLRA into the *McNeill* dictum is an awkward, uncomfortable fit.[10]

Courts have held, time and again, that the fact that a defense attorney did not raise a novel argument does not make her constitutionally ineffective.[11] This principle controls here.

---

but for his career offender status, and assuming that the Court did not find that he possessed a gun, Saxon had an offense level of 13 and was in criminal history category V, resulting in a Guidelines range of  30 to 37 months' imprisonment.  Counsel's strategy was to try to convince the Court to disregard the career offender guidelines given the small amount of drugs to which Saxon pled guilty.  *See* 12/19/12 Call ("I do not think that Edgardo Ramos is going to give you more than 5 years for selling a couple of pills to an undercover and telling them that you sold pills up there."); 5/22/13 Call (explaining that she was going to ask the Court to "sentence him as if it was just normal guidelines"); Ex. I at 11-20.  That is not ineffective assistance; it is a strategy regularly employed by defense attorneys, sometimes with success.  Saxon also points to a statement by his attorney that the AUSA thought he should receive "4 or 5 years."  Br. 5 n. 5.  The AUSA made no such statement; in any event, Saxon stated at his guilty plea that there was no "agreement, promise or understanding with the government about [his] plea and sentence" outside the Plea Agreement.  Ex. E at 19.

[10] The *Jackson* and *Calix* judges candidly acknowledged that their rulings were not dictated by Supreme Court or Second Circuit precedent.  *Jackson*, 2013 WL 4744828, at *4 ("Jackson's motion therefore presents a matter of first impression not addressed by either *McNeill* or *Rivera*."); *Calix*, 2014 WL 2084098, at *15 ("Neither the Supreme Court's decision in *McNeill* nor the Second Circuit's decision in *Rivera* answer the question raised by *Calix*.").

[11] *See, e.g.*, *Pierce* v. *United States*, 686 F.3d 529, 533 (8th Cir. 2012) ("[C]ounsel is not ineffective for failing to raise an argument that was novel at the time of the proceeding, even if later found to be meritorious."); *Spaziano* v. *Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994)

Even if the Court concludes that Saxon's ACCA claim is meritorious, trial counsel was not constitutionally deficient by failing to raise that claim.

### 3.   There Was No Prejudice

The ACCA claim is incorrect, and a motion based on that claim would have been destined to fail.  For that reason alone, there is no prejudice under *Strickland*.  But even if the Court holds that counsel was ineffective, the petition should still be denied because of the lack of prejudice.  In the alternate reality posited by Saxon, in which his counsel moved to dismiss the ACCA enhancement and prevailed, there is no reasonable probability that the outcome of the case would have been any different.  *See Hill* v. *Lockhart*, 474 U.S. 52, 59 (1985).

Saxon contends that the outcome would have been quite different.  He believes that his maximum possible sentence would have been 120 months, and that he would have faced guidelines of 70 to 87 months' imprisonment (with a plea) or 92 to 155 months' imprisonment (without a plea).  Br. 16-17.  Saxon declares that his sentence of 10 years' imprisonment "was almost three years higher than the *top* of the Guidelines range [he] would have faced had he simply pleaded guilty to the non-enhanced felon-in-possession charge."  Br. 3.  And he complains that his sentencing exposure "if he went to trial on the non-ACCA felon-in-possession charge and lost (92-115 months and 10 years maximum) was actually *lower* than his exposure under the plea agreement his trial counsel convinced him to accept (151-188 months and 20 years maximum)."  Br. 17.  The problem is that none of this is remotely correct.

---

("We have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."); *Gonzales* v. *Collins*, 14 F.3d 55, 1994 WL 14188, at *2 (5th Cir. Jan. 7, 1994) (unpublished opinion) ("[A]n attorney's failure to anticipate novel applications of existing case law does not amount to deficient performance under *Strickland*."); *Alexander* v. *Smith*, 311 Fed.App'x 875, 2009 WL 426261, at *10 (6th Cir. Feb. 20, 2009) (unpublished opinion) ("[F]ailing to raise a claim that does not follow logically or entail an inevitable extension of preexisting Sixth Amendment jurisprudence does not render [defendant's] appellate or trial counsel ineffective.").

21

First, as to the statutory maximum:  If the Court had ruled that Saxon was not subject to ACCA, his maximum possible sentence for being a felon in possession of a firearm would have been 120 months.  In that scenario, which would otherwise have sharply curtailed Saxon's sentencing exposure, the Government would have superseded with additional charges.  The Government would have charged Saxon with distributing and possessing with intent to distribute Alprazolam and Clonazepam, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(E)(2).  This charge, which carries a maximum sentence of 5 years, was Count Two of the Superseding Information.  As Saxon acknowledges, this charge was not derived from the Innocence Proffer, but rather was based on a then-pending state court charge arising out of Saxon's sale of pills to an undercover police officer.  Br. 2; Ex. E at 21.  And the Government would also have charged Saxon with distributing and possessing with intent to distribute heroin, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C).  Again, this charge, which carries a maximum sentence of 20 years, would not have been based on the Innocence Proffer; Saxon had been caught by police officers in the Bronx on August 13, 2011, with fifteen glassine envelopes of heroin tucked in his pants cuff.  In order to avoid the guidelines being capped by the statutory maximum sentence, the Government would have assumed this prosecution from the state as well.  Thus, even if Saxon had succeeded on the ACCA claim, he would have faced a total statutory maximum of 35 years' imprisonment.

Second, as to the Sentencing Guidelines:  Saxon seems to assume that for purposes of § 922(g), the applicable guideline is U.S.S.G. § 2K2.1(a)(2), which provides for a base offense level of 24 where a defendant possessed a firearm "subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense."  He is mistaken. The "Cross Reference" section of § 2K2.1 provides that "[i]f the defendant used or possessed

any firearm . . . cited in the offense of conviction in connection with the commission or attempted commission of another offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that" otherwise determined pursuant to § 2K2.1.  U.S.S.G. § 2K2.1(c)(1)(A).[12]  Section 2X1.1, in turn, provides that "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section."  U.S.S.G. § 2X1.1(c).

Here, Saxon entered a home with a loaded gun.  He pointed that gun at the head of Perez-Suarez.  When Moreira approached, Saxon shot at him twice, at close range.  *See* Ex. I at 3-6. As the Court noted at sentencing, "You fired a gun in a very confined space, and how no one was hurt is, in fact, something of a miracle."  *See* Ex. I at 23.  This is attempted murder, and the attempted murder guideline, U.S.S.G. § 2A2.1, determines the offense level.  *See, e.g.*, *United States* v. *Drew*, 200 F3d. 871, 878-79 (D.C. Cir. 2000).  That guideline provides for a base offense level of 33 "if the object of the offense would have constituted first degree murder," and otherwise sets a base offense level of 27.  U.S.S.G. §2A2.1(a).  The question is whether, had Saxon killed Moreira, the crime would have been first degree or second degree murder.  Under the circumstances, the Government submits that it would have been first degree murder.  That said, the Government acknowledges that the Court could find it to be second degree murder, given the uncertainty as to why Saxon was there and the fact that he was intoxicated.[13]

---

[12] Application Note 14(C) to § 2K2.1 explains that "'Another offense,' for purposes of subsection (c)(1), means any federal, state, or local offense, other than the . . . firearms possession . . . regardless of whether a criminal charge was brought, or a conviction obtained."

[13] Application Note 1 to U.S.S.G. § 2A2.1 defines first degree murder as "conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111.  Section 1111 defines murder as "the unlawful killing of a human being with malice aforethought."  First degree murder encompasses "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing."  The difference between first degree murder and second

In any event, both the pills charge and the heroin charge would render Saxon a career offender.  *See* U.S.S.G. § 4B1.1(a).  Accordingly, his criminal history category would be VI, and his offense level would the greater of 32 (the offense level pursuant to the table in § 4B1.1(b)) and the offense level "otherwise applicable."  *See* U.S.S.G. § 4B1.1(b).  If the first degree attempted murder guideline applies, the offense level otherwise applicable would be 33.  If the second degree attempted murder guideline applies, the offense level otherwise applicable would be 32.  Thus, if Saxon prevailed on the ACCA claim, he would be in criminal history category VI, with an offense level of 32 or 33.  If he lost at trial, his guidelines would be at least 210 to 262 months' imprisonment.  At most, they would be 235 to 293 months' imprisonment.[14]

These are astronomical numbers.  The Government submits that in the face of this sentencing exposure, there is no reason to think, let alone evidence to show, that Saxon would have rejected the deal he actually took, in which the bottom of the guidelines range was 151 months' imprisonment.  Indeed, the post-trial Guidelines would have included a finding of attempted murder; trial counsel would have been hard pressed to argue that the Guidelines range was improperly exaggerated because of Saxon's career offender status.  The plea agreement that trial counsel actually secured for Saxon, by contrast, (1) did not require Saxon to admit that he

---

degree murder is premeditation.  *See United States* v. *Begay*, 673 F.3d 1038, 1042 (9th Cir. 2011) "Premeditation may be proved by circumstantial evidence including, but not limited to, the defendant's prior relationship to the victim, the defendant's carrying of the murder weapon to the scene, and the manner of the killing."  *United States* v. *Corbett*, 2011 WL 2144659, at *5 (D. Conn. May 31, 2011) (internal quotation marks omitted).  While "[t]here must be some appreciable time for reflection and consideration before execution of the act . . . the period of time does not require the lapse of days or hours or even minutes."  *United States* v. *Shaw*, 701 F.2d 367, 393 (5th Cir. 1983) (internal quotation marks omitted).  Voluntary intoxication "can negate the existence of the premeditation required for first degree murder," *United States* v. *Sands*, 968 F.2d 1058, 1064 (10th Cir. 1992), but is not a defense to second degree murder. *United States* v. *Hatatley*, 130 F.3d 1399, 1405 (10th Cir. 1997).

[14] The Government is not arguing that trial counsel considered these alternative scenarios.  To the contrary, trial counsel always assumed (correctly) that ACCA applied.  But had trial counsel advanced the ACCA claim and prevailed, this would have been Saxon's sentencing exposure.

even possessed the gun; (2) left open the possibility that the Government would not try to prove that possession, or try to prove the possession and fail; (3) did not rely on U.S.S.G. § 2K2.1 at all, thus taking the attempted murder guidelines completely off the table, and instead relied on U.S.S.G. § 2D1.1, so that possession of the firearm would at most result in a two-level increase under § 2D1.1(b)(1); and (4) created a situation in which, but for Saxon's career offender status, his offense level was at most 15 (including a two-level enhancement for the gun), with criminal history category V, and a resulting guidelines range of 37 to 46 months' imprisonment, thereby arming Saxon's counsel to argue that the Court should disregard the career offender guidelines.

In short, trial counsel got Saxon a great plea deal, whether or not ACCA applies. Either way, he was facing a post-trial sentence far in excess of his guidelines range under the Plea Agreement. The notion that he would have gone to trial had he prevailed on his ACCA claim is pure speculation. It comes nowhere close to meeting his heavy burden of demonstrating actual prejudice. *See Harrington*, 131 S. Ct. at 791-92. Accordingly, the motion should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the motion be denied without a hearing.

Dated: New York, New York
      November 6, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:   /s/ Michael Gerber         
       Michael Gerber
       Assistant United States Attorney
       (212) 637-2470